UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

MAGGIE J. MCNELIS,                                Civil No. 11-16 (SRN/LIB)

              Plaintiff,
v.                                                                 **REPORT AND**
                                                                   **RECOMMENDATION**
MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

---

Plaintiff Maggie McNelis seeks judicial review of the decision of the Commissioner of

Social Security ("Commissioner") denying her application for disability insurance benefits

("DIB").  The matter was referred to the undersigned United States Magistrate Judge for Report

and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has

jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1283(c).  Both parties submitted

motions for summary judgment.  For the reasons set forth below, the Court recommends that

Plaintiff's motion for summary judgment be DENIED and the Defendant's motion for summary

judgment be GRANTED.

I.      **BACKGROUND**

    A.      **Procedural History**

In November 2005, Plaintiff filed an application for DIB commencing on August 10,

2003 with a date last insured of September 30, 2003.  (Tr. 17).[1]  The Commissioner denied the

claim initially and upon reconsideration.  (Tr. 17, 42, 48).  Plaintiff filed a Request for Hearing

---

[1] Throughout this Report and Recommendation, this Court refers to the administrative record for the present case by
the abbreviation "Tr."  The record consists of more than 1,000 pages. The court has endeavored to limit the
background discussion to only those portions relevant to the issues raised by the cross-motions for summary
judgment.

by Administrative Law Judge in April 1, 2007. (Tr. 43).  Administrative Law Judge ("ALJ")

George Gaffaney conducted a hearing on August 6, 2008.  (Tr. 17).  After the hearing, the ALJ

issued a decision denying Plaintiff's request for benefits on November 10, 2008.  (Tr. 30).   The

ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  Id.

Plaintiff sought review of the decision with the Appeals Council, but it denied review on

November 10, 2008.  (Tr. 30).  Thus, the ALJ's decision became the final decision of the

Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

### B.    Factual History

Plaintiff was born on December 6, 1981 making her 21 years old at her alleged onset date

of August 10, 2003.  (Tr. 28).  Plaintiff obtained a GED, and from 2002 through 2003, she

completed three semesters of business school towards becoming a medical assistant.  (Tr. 28).

Plaintiff claims she quit school due to her impairments in September 2003.  (Tr. 1076-77).

Plaintiff has worked as a cashier/bagger and a child care worker.  (Tr. 104, 111).

Plaintiff testified that she first got treated for depression when she was 14 or 15.  (Tr.

1072).  Plaintiff states that her main problems currently are back pain, anxiety, and depression.

(Tr. 1079).  She described her back pain as excruciating with a burning pain that goes down her

left leg.  (Tr. 1079).  This pain causes her leg to be weak.  (Tr. 1079).  Plaintiff further testified

that she cannot lean on her left leg at all.  (Tr. 1079).  Plaintiff described the pain as constant.

(Tr. 1079).  Walking made the pain worse.  (Tr. 1080).  Before she turned 22, Plaintiff had to lay

down 3-4 times a day to relieve her back pain.  Plaintiff started using a cane in 2006.  (Tr. 1067).

The pain medications administered for Plaintiff's back pain caused her to suffer increased

anxiety and difficulty concentrating.  (Tr. 1088).

Plaintiff also testified that she suffered from depression and anxiety before she turned 22, but had no insurance so she could not get treated.  (Tr. 1084).  Plaintiff testified that she suffered from at least one panic attack per week in 2003.  (Tr. 1084).  At that time, Plaintiff stated that she had trouble getting along with her family.  (Tr. 1084).

Additionally, Plaintiff testified that in 2003 she could fix small meals for herself, but had problems with hygiene such as shaving her legs.  (Tr. 1089).

### C.    Medical Evidence in the Record[2]

On May 29, 2003, Plaintiff saw physician's assistant Desde Palmer for low back pain which had started four days earlier.  (Tr. 381).   On physical examination, the physician's assistant noted some tenderness in the left sacroiliac area as in the piriformis muscle region.  (Tr. 381).  Moreover, the straight leg raise was mildly positive on the left side.  (Tr. 381).  DTRs were normal, but range of motion and anterior bending were moderately limited secondary to pain.  (Tr. 381).  Plaintiff was given Flexeril and Tylenol with codeine for the pain.  (Tr. 381).

Plaintiff presented to Park Nicollet Clinic on June 2, 2003 for back pain.  (Tr. 379).  A physical exam showed a tenderness of the paravertebral muscle and sacroiliac area.  (Tr. 379).  Increased pain and moderate loss of range of motion with anterior bending and posterior bending was noted.  (Tr. 379). No increased pain was found on right and left lateral bending.  (Tr. 379).  Some mild discomfort was noted with the left straight leg raise.  (Tr. 379).  Patient was given ibuprofen and Tylenol with codeine.  (Tr. 380).

Plaintiff was treated by Dr. Burgfetchel on July 21, 2003 for lower back pain.  (Tr. 377).  At that time, the Plaintiff reported she had been suffering persistent back pain for over two

---

[2] Because Plaintiff's is only seeking disability benefits for the time period before her 22nd birthday, the Court primarily outlines records from before and shortly after Plaintiff's 22nd birthday in the following analysis.  The Court also includes those records which purportedly discuss the origins of Plaintiff's impairments.

months.  (Tr. 377).  An exam showed negative straight leg raising, symmetrical reflexes and normal flexion.  (Tr. 377).  Plaintiff was prescribed physical therapy. (Tr. 378).

Dr. Lubka treated Plaintiff for back pain at Park Nicollet Clinic on July 25, 2003.  (Tr. 375).  She had intact reflexes, but a positive straight leg raise at about 45 degrees was indicated. (Tr. 375).  Tenderness was found in the left side of the lumbar paraspinous muscles.  (Tr. 375).  The doctor gave her Percocet and recommended an MRI.  (Tr. 376).

In July 2003, Plaintiff presented for a spinal MRI.  (Tr. 331).  The MRI showed vertebral body and disc space heights to be normal.  (Tr. 331).  At L5-S1, the MRI found a small annular tear within the central and left paracentral portions of the disc where there was a small superimposed disc protrusion.  (Tr. 331).  The MRI found no definite impingement of the traversing or exiting nerve roots.  (Tr. 331).  Mild degenerative arthritis in the facet joints was noted.  (Tr. 331).

Dr. Lubka reviewed Plaintiff's MRI with her showing that no focal nerve impingement was shown.  (Tr. 372),  Dr. Lubka noted that the sciatica pain suggested that something was causing the pain.  (Tr. 372).  The doctor recommended conservative treatment to start with possible microdiskectomy if pain did not improve.  (Tr. 373).  The doctor was also concerned about a dependence on opiates.  (Tr. 373).  However, he further noted that he did not think Plaintiff was willfully trying to be a drug seeker, but the number of medicines taken was not appropriate.  (Tr. 373).  He gave her a small amount of Percocet and reminded her to use it sparingly.  (Tr. 373).  If the pain did not improve, he recommended an epidural injection.  (Tr. 373).  If the doctor was not able to wean her off pain medicine, he stated he would no longer prescribe them and would arrange for treatment at a chronic pain clinic.  (Tr. 373).

Plaintiff presented for treatment of lower back pain at the emergency room on August 10, 2003.  (Tr. 925).

On August 12, 2003, Plaintiff was treated at Park Nicollet Clinic for lower back pain.  (Tr. 370).  Range of motion in the lumbar spine was full with pain while engaging in posterior bending and left lateral bending.  (Tr. 370).  Plaintiff was prescribed physical therapy, referred to a neurologist, and given Percocet.  (Tr. 371).

Plaintiff again presented at Park Nicollet Clinic for lower back pain on September 12, 2003.  (Tr. 366).  An examination showed no spinal deformity and no tenderness, but left leg raise was positive.  (Tr. 366).  Range of motion was full in the lumbar spine.  (Tr. 366).  Pain increased with posterior bending.  (Tr. 366).  The treating provider recommended an epidural injection and Percocet.  (Tr. 366).

Plaintiff presented for a steroid injection in her back on September 17, 2003.  (Tr. 330).

Physician's assistant Gina Cincinelli treated Plaintiff's low  back pain on September 29, 2003.  (Tr. 411).  Before the appointment, Plaintiff had completed 6 to 7 sessions of physical therapy.  (Tr. 411).  Plaintiff reported that they provided some relief.  (Tr. 411).  A steroid injection also provided relief for four days.  (Tr. 411).

Emergency room doctors treated Plaintiff for back pain on September 21, 2003.  (Tr. 923).  The doctor again noted the results of her earlier MRI.  The doctor also observed normal movement.  (Tr. 924).  The doctor counseled Plaintiff about the adverse outcomes with accelerated narcotic abuse and the need for controlling it by having one doctor monitor prescriptions.  (Tr. 924).  Plaintiff was told not to seek anymore narcotic pain medicine through the emergency department.  (Tr. 924).

On September 29, 2003, the Plaintiff presented for treatment with Gina Cincinelli at Park Nicollet. (Tr. 363). A physical examination showed a limited lumbar range of motion upon flexion and extension. (Tr. 363). A positive sitting straight leg on the left was observed as well as positive tenderness to palpation over the left SI joint and midline lumbosacral spine at L5-S1. (Tr. 363). The patient ambulated without gross disturbances. (Tr. 363). Plaintiff was hypersensitive to pinprick on the left lateral thigh, dorsal foot, great toe and remainder of digits on left foot. (Tr. 364). Muscle strength was mildly weak on the left hamstring muscle with loose flexion on the left 4 + 5. (Tr. 364). Ms. Cincinelli concluded that Plaintiff suffered from left S1 radiculpathy secondary to small L5-S1 disc protrusion without definitive nerve root impairment. (Tr 364). Conservative treatment was recommended including physical therapy, traction, massage, ultrasound and a TENS Unit. (Tr. 364).

Plaintiff presented to the emergency department for treatment of back pain on September 30, 2003. (Tr. 920). The doctor noted that there was some confusion with the Plaintiff and her family regarding who was prescribing her pain medication. (Tr. 920). The doctor found Plaintiff to be a complicated pain medication case considering her multiple narcotic medication especially "since her MRI does not reveal any injury that is consistent with her pain. This may represent a growing narcotic dependence problem, more so than a back injury problem." (Tr. 920).

On October 6, 2003, Plaintiff received treatment in the emergency room for back pain. (Tr. 916). Plaintiff complained of increasing back pain. (Tr. 916). Physical exam demonstrated some tenderness over the left paraspinal muscles with no discernible spasm. (Tr. 917). A left straight leg raise caused pain. (Tr. 917). Strength was intact in the lower extremities, but extremely limited by pain. (Tr. 917). Further, sensation was decreased on the left leg. (Tr. 917). The doctor found acute exacerbation of chronic low back pain and suspected that her tolerance of

pain medication is escalating.  (Tr. 918).  Plaintiff was prescribed pain medication and counseled to follow up in physical medicine and rehabilitation.  (Tr. 918).

Plaintiff visited physician's assistant Gina Cincinelli on October 7, 2003 for low back pain.  (Tr. 408).  Ms. Cincinelli again reviewed the earlier MRI findings showing a small midline disc herniation at L5-S1 with preservation of disc space height and disc hydration.  (Tr. 408). Physical examination evinced good muscle strength, negative sitting straight leg raises bilaterally, and positive tenderness to palpation over the midline lumbosacral spine and paraspinous muscle.  (Tr. 409).  Ms. Cincinelli also noted minimal progression of central L5-S1 disc protrusion without definite nerve root impingement.  (Tr. 409).  The physician's assistant did not refill Plaintiff's narcotic pain medication because she was given a refill a week before. (Tr. 409).  Plaintiff could not continue to take the amount of narcotic medication she was taking. (Tr. 409).  Ms. Cincinelli was unsure what was causing the patient's pain and opined that from a neurosurgical perspective her MRI was within normal limits.  (Tr. 409).  Plaintiff was admitted to the hospital for pain management.  (Tr. 409).

On October 7, 2003, Plaintiff had an X-Ray of the lumbar spine.  (Tr. 329).  It showed that the lumbar vertebral and disk spaces appeared normal.  (Tr. 329).  Very slight wedging of L1 and T12 was noted which might have been developmental or due to old trauma.  (Tr. 329).  The vertebral height was found to otherwise to be normal.  (Tr. 329).

Plaintiff presented to the Medical Pain Clinics on October 14, 2003.  (Tr. 823).  Plaintiff described her pain as beginning in her low back and radiating down her left lower extremity. (Tr. 823).  The doctor reviewed her diagnostic tests and performed a physical exam.  (Tr. 825). The exam evinced normal gait, normal flexion, and normal reflexes.  (Tr. 825).  However, a straight leg raise was positive for pain in the low back pain radiating down the lower leg.  (Tr.

825).  Decreased sensation to pinprick in the lateral aspect at the L4-5, L5-S1was noted.  (Tr. 825).  The doctor opined that she was experiencing lumbar radicular type pain which may be discogenic or related to nerve root irritation.  (Tr. 825).  Moreover, the doctor stated that Plaintiff may have a chemical dependency problem.  (Tr. 825).  The pain clinic agreed to take over prescribing medications to Plaintiff to help wean her off narcotics.  (Tr. 825).  The doctor further recommended physical therapy and psychotherapy. (Tr. 825).

Plaintiff saw Dr. Kurtti for low back pain on October 16, 2003.  At that time, an examination showed guarded low back range of motion, moderately limited flexion, moderately to severely limited flexion, moderate pain with other movement.  (Tr. 405).  Palpation showed tenderness throughout the lumbar spine.  (Tr. 405).  Plaintiff experienced pain in moving either leg, but more so on the left.  (Tr. 405). Significant range of motion loss was not noted, but there was some pain on movement.  (Tr. 405).  Moderate pain in the left low back, buttock and thigh was found on the left leg raise.  (Tr. 405).  Stability and tone was normal in both lower extremities.  (Tr. 405). Light touch sensation was somewhat reduced in the left foot, left lower leg, and left great and second toes.  (Tr. 406).  The doctor diagnosed her with L5-S1 disc protrusion, annular tear, severe low back pain, and left sciatica.  (Tr. 406).  The doctor recommended treatment by a pain specialist, physical therapy, and tapering pain medication. (Tr. 406).

Dr. Kurtti treated Plaintiff for low back pain on December 2, 2003.  (Tr. 398).  Dr. Kurtti found lumbar spine range of motion to be better.  (Tr. 398).  Her flexion was mildly to moderately limited, extension was mildly limited, and lateral bending was mildly limiting bilaterally. (Tr. 398).  Some mild tenderness to the lower lumbar spine was noted. (Tr. 399).

Plaintiff was given Tylenol #3 instead of Percocet and was referred to United Pain Center and pool therapy.  (Tr. 399).

Plaintiff saw Dr. Reddy on December 12, 2003 who diagnosed her with withdrawal from pain medication.  (Tr. 396).

On January 7, 2004, Plaintiff was treated by Dr. Manning on January 7, 2004 for low back pain.  (Tr. 392).  The doctor noted Plaintiff was hospitalized for low back pain in November and had a torn disk on her left side. (Tr. 392).  He also noted that Plaintiff has reduced her reliance on narcotics.  (Tr. 392).  Dr. Manning found that Plaintiff could toe and heel walk normally and straight leg raising was completed without discomfort. (Tr. 393). She had normal strength and senses in her legs.  (Tr. 393).  The doctor did not prescribe narcotic medication. (Tr. 393).

Plaintiff presented Dr. Reddy for low back pain on January 8, 2004. (Tr. 390).  An exam showed straight leg raise to be less than 45 degrees on the left side. (Tr. 390)  Patient had some decreased quadriceps tone and strength and had some pain on left side low back on palpation. (Tr. 390).  Patient was given an injection for the pain and was sent to the emergency room.  (Tr. 390).  The doctor wanted to rule out a ruptured lumbar disk.  (Tr. 390).

Plaintiff underwent a new MRI on January 8, 2004 showing the lumbar vertebral narrow signal height and alignment to be within normal limits.  (Tr. 326). The L1-L5 disks appeared normal and intact, but with mild degenerative facet disease found at L3-4 and L4-5 levels.  (Tr. 326).  Likewise, at L5-S1 the MRI showed mild loss of disk height and hydration and there was a broad posterior disk protrusion slightly deforming the thecal sac and contacting the S1 nerve roots.  (Tr. 326).  Mild facet degenerative changes were noted. (Tr. 326).

A X-Ray of the lumbar lateral spine showed no degenerative change disc space narrowing, vertebral spondylolysis or vertebral malalignment.  (Tr. 325).

Once again, Plaintiff presented to the emergency room for treatment of back pain on January 20, 2004.  (Tr. 906).  The doctor cautioned her that the more providers she went to and the more frequent her visits to the ER, the more likely that she would be labeled with drug seeking behavior and refused treatment.  (Tr. 906).  The doctor talked to her primary care physician's assistant, Desde Palmer, who felt that the Plaintiff had a drug dependence problem. (Tr. 906).  The doctor additionally opined that she did not think it was appropriate for the Plaintiff to present to the emergency room for pain management.  (Tr. 906).

Dr. Kurtti treated Plaintiff on January 22, 2004 for back pain.  (Tr. 384).  He noted that a previous MRI showed posterior disk protrustion at L5-S1 with no definite nerve root compression.  (Tr. 385).  Gait was normal, but palpation revealed tenderness through the lumbar spine and into the sacroiliac area on the left side.  (Tr. 385).  Lumbar motion was restricted due to pain and flexion was moderately to severely restricted with moderate pain.  (Tr. 385). Extension and laterally bending were moderately limited.  (Tr. 385).  She was diagnosed low back pain, left leg pain, sciatica, left leg paresthesis, lumbar spine degenerative disk disease, and L5-S1 broad disk protrusion.  (Tr. 385).  The doctor prescribed Percocet with no refill and was scheduled for a recheck for her pain.  (Tr. 385). The doctor opined that he hoped the use of Percocet would be short term.  (Tr. 385).

Plaintiff again presented to the emergency room on January 26, 2004.  At that time, the doctor noted her long history of low back pain and reported that she complained about lower back pain and leg weakness.  (Tr. 158).    In addition, the doctor noted that she had a L5-S2 disk herniation with very mild impingement of the left S1 nerve root.  (Tr. 158).   The emergency

room doctor administered morphine and Toradol and admitted her for pain control and pain management. (Tr. 159). Moreover, the Plaintiff reported that her pain began over the summer with no known precipitating event.  (Tr. 162).  She further reported that her pain was somewhat better in December, but got worse after a lifting incident.  (Tr. 162). Another MRI at this visit showed a midline broad-based L5-S1 focal disk herniation, which contacts but does not compress or displace the S1 nerve root.  (Tr. 162).  No evidence of any foraminal stenosis was found.  (Tr. 162).  A physical examination at the emergency room showed an alert, pleasant female tender to palpation over her left L5-S1 facet region, her left SI joint, as well as her left gluteus and sciatic notch region. (Tr. 163).  A positive straight leg range was noted on the left side at 45 degrees which increased her leg pain.  (Tr. 163). Similarly, at 30 degrees dorisflexion of her foot increased her pain.  (Tr. 163). Reflexes were symmetrical.  (Tr. 163).  However, on a pinprick exam the doctor found her S2 sensation decreased.  (Tr. 164).  The emergency room doctor noted that her pain was out of proportion to what was found on the MRI scan.  (Tr. 164). Dr. Block expressed concern that Plaintiff was too dependent on narcotics.  (Tr. 903).

A psychiatric exam at the hospital details that Plaintiff has been on Prozac since her teens. (Tr. 165). Moreover, no history of panic attacks, obsessions, compulsions, or phobias was noted.  (Tr. 165).   Dr. Boyle found Plaintiff to suffer from generalized anxiety disorder, depressive disorder, NOS, chronic pain syndrome, and probable dependent personality disorder with a GAF Score of 40.  (Tr. 167).

The MRI from late January 2004 showed the bony sacrum, the adjacent ilia, and the sacroiliac joints to be within normal limits.  (Tr. 322).  There was a small midline broad-based L5-S1 disc protrusion without definite compression of the S1 nerve roots and there were mild L5-S1 facet degenerative changes.  (Tr. 322).  The L1-2 through L4-5 disks appeared to be of

normal height and hydration and appear intact.  (Tr. 323).  At L5-S1, the MRI demonstrated mild

loss of disc height and hydration and a small broad-based posterior midline disk protrusion

which contacts but does not displace or compress the S1 nerve roots.  (Tr. 323).  No evidence of

central or foraminal stenosis was found, but the MRI did show mild fact degenerative change.

(Tr. 323).

Plaintiff presented to Dr. Schwender for back pain on Febraury 3, 2004.  (Tr. 428).  Dr.

Schwender's physical examination evinced minimal motion of the lumbar spine, negative

straight leg raising, and no focal motor deficits.  (Tr. 428).

Plaintiff presented to the emergency room for low back pain on February 7, 2004.  (Tr.

426).  The doctor performing the physical examination noted that strength was difficult to

determine because the Plaintiff gave poor effort.  (Tr. 427).  Plaintiff was diagnosed with chronic

low back pain and left leg radicular symptoms.  (Tr. 427).  Before her discharge, the doctor

confronted Plaintiff with her excessive use of narcotics.  (Tr. 170).

Dr. Anderson treated Plaintiff on February 17, 2004.  (Tr. 423).  Plaintiff was continuing

to wean off her medication.  (Tr. 423). She recently underwent a steroid injection.  (Tr. 423).

Physical exam showed no pain on palpation and no pain on leg raise with good strength.  (Tr.

423).

Plaintiff underwent a psychiatric evaluation on May 10, 2004.  (Tr. 437).  Dr. Fitch

reported that Plaintiff's depression started at a young age.  (Tr. 438).  She was admitted to a

psychiatric unit for overnight treatment at one time.  (Tr. 438).  Dr. Fitch diagnosed her with

major depression and anxiety disorder.  (Tr. 440).

On June 30, 2004, Dr. Fitch treated Plaintiff for mental health issues.  (Tr. 429).  Plaintiff

was diagnosed with major depression and anxiety.  (Tr. 430).

Dr. Fitch treated Plaintiff for mental health issues on November 16, 2004.  She noted that Plaintiff suffers from anxiety and major depressive disorder. (Tr. 475).

Plaintiff presented for treatment on June 1, 2005 with psychologist Ben Laxau.  (Tr. 818). He again diagnosed Plaintiff with major depressive disorder and anxiety disorder.  (Tr. 818). Moreover, the provider noted that Plaintiff's history of anxiety and depression contributed to her pain experience and she identifies herself as quite disabled.  (Tr. 818).  He noted "[s]he is quite suggestible and apparently has come to believe that a physician or physicians advised her that she 'cannot do anything' with regards to school work or employment.  The patient is quite invested in the idea that she is completely disabled, and this appears to be quite a premature and harmful belief that is likely to maintain pain behavior to a high degree."  (Tr. 818). Finally, he noted that Plaintiff would benefit from a multidisciplinary pain management strategy.  (Tr. 818).

On January 29, 2007, Plaintiff presented for a psychological evaluation with Harlan Gilbertson.  At this appointment, Plaintiff reported that her mental illnesses required inpatient hospitalization at 16 years old.  (Tr. 307). He concluded that Plaintiff suffers from Major Depressive Disorder, Recurrent of Moderate Severity, and Pain Disorder with both Psychological Factors/Medical Conditions.  (Tr. 311).   He formulated a GAF store of 45. (Tr. 311).  On the basis of these findings, the psychologist concluded that Plaintiff's capacity to understand, remember, and follow brief directions was mildly impaired.  (Tr. 312).  In addition, Plaintiff exhibited adequate ability to attend, moderately impaired ability to sustain concentration, markedly impaired ability to simultaneously process information, and severe impairment of her verbal recall ability.  (Tr. 312).  Moreover, Plaintiff's ability to carry out work-life tasks with reasonable persistence and pace was markedly impaired.  (Tr. 312).  Lastly,

13

the psychologist opined that Plaintiff would experience marked impairment in her ability to

tolerate stress and pressure typically found within an entry-level workplace setting.  (Tr. 312).

Dr. Dan Larson, a state consulting physician, undertook a psychiatric review of Plaintiff's

medical records and formulated an RFC on February 23, 2007 for alleged disabling psychiatric

problems beginning on August 10, 2003.  (Tr. 930).   Dr. Larson concluded that Plaintiff suffered

from depression.  (Tr. 933).   Moreover, he concluded that her depression mildly restricted her

activities of daily living, mildly restricted her ability to maintain social functioning, moderately

caused difficulties in maintaining concentration, persistence, or pace and caused no episodes of

decompensation.  (Tr. 940).   Additionally, Dr. Larson concluded that Plaintiff's ability to

remember location, remember work procedures, ability to understand and remember short and

simple instructions were not significantly limited.  (Tr. 944).   However, her ability to understand

and remember detailed instructions was moderately limited.  (Tr. 944).   Plaintiff's abilities to

carry out very short and simple instructions, perform activities within a schedule, sustain a

routine without supervision and make simple work-related decisions were not significantly

limited.  (Tr. 944).   Dr. Larson determined that Plaintiff's abilities to carry out detailed

instructions, maintain attention and concentration for extended periods, and work in coordination

with or proximity to others were moderately limited.  (Tr. 944).   Similarly, Plaintiff could

complete a normal workweek without interruptions, ask simple questions, accept instruction,

respond to criticism, get along with coworkers, maintain socially appropriate behavior, respond

to changes in the work setting, be aware of normal hazards, travel in unfamiliar places, and set

realistic goals.  (Tr. 945).   However, Plaintiff's depression would moderately limit her ability to

interact appropriately with the general public.  (Tr. 945).   In making these determinations, Dr.

Larson considered the effects of Plaintiff's pain. (Tr. 946). This decision was affirmed by James Alsdurf on May 31, 2007. (Tr. 953).

Dr. Charles Grant, a state agency consulting physician, formulated a physical RFC examination regarding Plaintiff on February 8, 2008. (Tr. 953). He concluded that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk for 6 hours a day, sit for 6 hours a day, and engage in unlimited pushing or pulling. (Tr. 955). No postural, manipulative, visual, communicative, or environmetneal limitations were established. (Tr. 956). Dr. Aaron Mark affirmed the RFC finding on June 1, 2007. (Tr. 967),

Another psychiatric review was undertaken by Dr. Paul Berry on June 13, 2007 for Plaintiff's alleged mental impairments from August 10, 2003 through October 31, 2005. (Tr. 968). He determined that Plaintiff's impairments were not severe and found Plaintiff suffered from depression. (Tr. 971). Moreover, he concluded that her depression mildly restricted her activities of daily living, mildly restricted her ability to maintain social functioning, mildly caused difficulties in maintaining concentration, persistence, or pace and caused no episodes of decompensation. (Tr. 978).[3]

Plaintiff provided an RFC analysis completed by Dr. Stormo on August 4, 2008. (Tr. 1019-1022). Dr. Stormo began treating Plaintiff on august 4, 2004, after her 22nd birthday. Dr. Storm diagnosed Plaintiff with anxiety, pain disorder, depression. (Tr. 1019). Dr. Storm found that Plaintiff did not suffer any restrictions on her activities of daily living. (Tr. 1020). Plaintiff had moderate difficulties in maintaining social functioning, moderate deficiencies in concentration, persistence and pace, and marked episodes of deterioration or decompensation. (Tr. 1020-21).

---

[3] Dr. Berry also completed an RFC for Plaintiff's impairment from November 1, 2005 through June 13, 2007 in which he found Plaintiff suffered from severe impairments. (Tr. 996). This period is outside of and subsequent to the period for which Plaintiff seeks disability benefits. See, fn. 2 and fn. 4.

15

Plaintiff also presented an RFC from Dr. Roger Rhodes covering the period from February 25, 1998 to July 25, 2008.  He noted that Plaintiff suffered from chronic pelvic pain, endometriosis, irritable bowel, neurogenic bladder and back pain. (Tr. 1027).  He concluded that Plaintiff would have to lie down three to four times a day for 30-40 minutes.  (Tr. 1027). Additionally, Dr. Rhodes found her condition to be chronic with a poor prognosis.  (Tr. 1028). Likewise, he concluded that work would be impossible and that she could sit up to 15 minutes continuously  for a total of one hour; stand up to 20 minutes continuously for a total of two hours; and walk 10-15 minutes for a total of one hour in an 8 hour workday.  (Tr. 1028).  Dr. Rhodes further limited her daily activities by stating that she could only occasionally lift up to 20 pounds, could never lift more than 20 pounds, could occasionally bend, could occasionally squat, could never climb and could occasionally reach.  (Tr. 1029).  Further, Plaintiff's physical conditions required moderate restrictions around heights, moderate restrictions regarding exposure to changes in temperature, moderate restrictions on stress, total restrictions regarding hazardous machinery, and a total prohibition on driving.  (Tr. 1029-30).[4]

Dr. Kurtti also filled out an RFC on August 1, 2008. (Tr. 1044).  Although the handwriting was difficult to decipher, it appears he began treating Plaintiff on November 19, 2004.[5]  (Tr. 1044).  He treated her for back pain.  (Tr. 1044).  He concluded that Plaintiff needed to lie down 20 minutes a day three to four times a day.  (Tr. 1044).  Dr. Kurtti opined that Plaintiff's prognosis was poor for return to work.  (Tr. 1045).  Moreover, Plaintiff could sit 15 minutes for a total of one hour a day; stand up to 20 minutes up to 2 hours in a day; and walk 10-15 minutes for a total of 2 hours a day. (Tr. 1045).  Dr. Kurtti additionally limited her daily

---

[4] Dr. Rhodes did treat Plaintiff during that relevant time period.  However, the records appear to be primarily related to gynecological issues and have limited relevance to the ALJ's decision.
[5] However, the Court's review of the records shows that Dr. Kurtti first began treating Plaintiff in October 2003. (Tr. 404).

activities by stating that she could only occasionally lift up to 10 pounds, could never lift more

than 10 pounds, could never bend, could never squat, could occasionally climb and could

occasionally reach.  (Tr. 1029).  Further, Plaintiff's physical conditions required total restrictions

regarding unprotected heights, no restrictions regarding exposure to changes in temperature, total

restrictions around hazardous machinery, and no prohibitions on driving.  (Tr. 1029-30).

Kimberly Fitch completed an RFC on the basis of Plaintiff's mental impairments on

September 28, 2008.  (Tr. 1048).  Ms. Fitch began treating Plaintiff on May 10, 2004.  (Tr.

1048).  She concluded that Plaintiff suffered from depression and anxiety. (Tr. 1048).  Ms. Fitch

further opined that Plaintiff's daily living was moderately limited, Plaintiff's ability to maintain

social functioning was markedly limited, Plaintiff has marked deficiency in concentration

persistence or pace, and marked deterioration or decompensation.  (Tr. 1049-50).

### D.      Evidence from the Vocational Expert

A vocational expert, Steve Bosch, testified at the administrative hearing.  (Tr. 1092).  The

ALJ asked Bosch to consider what jobs a 21 year old could perform if her lifting was limited to

15 to 20 pounds occasionally and ten pounds frequently and if she could stand and sit six hours

each day.  (Tr. 1094).  The ALJ further limited the question to prohibit ladder climbing, and to

provide for occasional stair climbing, balancing, stooping, kneeling, crouching and crawling.  Id.

In response to this hypothetical question, Bosch stated that Plaintiff could not perform her former

work as a daycare worker.  (Tr. 1094).

Next, the ALJ asked the VE what jobs a 21 year old with the same exertional limits as

outlined above could perform if she could only lift 10 pounds occasionally, five pounds

frequently and could only stand for two hours a day.  (Tr. 1094).  Bosch responded that such a

person could not perform her past relevant work.  (Tr. 1094).  However, the VE further testified

that such a person could perform some jobs such as an optical assembler, semi-conductor bonder, and a security monitor.  (Tr. 1094-95).  Bosch concluded that such jobs existed in significant numbers in the national economy.  Id.

Plaintiffs' attorney asked a final question to the VE.  He limited the ALJ's second hypothetical question to determine what jobs a person with the above limitations could perform if that the person would be required to lay down three or four times a day for 30 to 40 minutes. (Tr. 1095).  The VE responded that no work would be available for such an individual.  (Tr. 1095).  Finally, the Plaintiffs' attorney asked whether a person with the functional limitations described by the ALJ in his first two questions to the VE would be able to perform competitive employment if that person missed two or three days of work per month.  (Tr. 1096).  As to this question, the VE replied that competitive employment would not be compatible with such a situation.

### E.    The ALJ's Decision

The ALJ determined Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 22).  In reaching his decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient residual functional capacity (RFC) to return to their past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy.  20 C.F.R. § 404.1520(a)-(f).[6]

---

[6] Plaintiff brings her claim for disability benefits prior to attaining the age of 22.  To be eligible for such benefits, the Plaintiff must have a disability before attainment of age 22.  20 C.F.R. § 404.350(a)(5).  In making such a determination, the ALJ follows the same five step sequential analysis as for adult disability references.  20 C.F.R. § 404.1520(a)-(f).  See 42 U.S.C. §§ 402(d)(1), 423(d)(1); 20 C.F.R. § 404.350.

At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial work from her alleged onset date of August 10, 2003 through her date last insured, September 30, 2003 or the day before her 22nd birthday, December 6, 2003.  (Tr. 21).

Next, at step two, the ALJ determined that the Plaintiff suffered from severe impairments including lumbosacral neuritis NOS, mild degenerative disk disease at L5-S1, and a history of two laparoscopic surgeries at ages 16 and 18 for endometriosis, depressive disorder NOS, anxiety and chronic pain syndrome with narcotic addiction and tobacco abuse recently in remission through the date last insured and to age 22.  Id.

Turning to step three of the analysis, the ALJ concluded that prior to attaining age 22, Plaintiff's impairment or combination of impairments did not meet or equal one of the listed impairments in 20 C.F.R., part 404, subpart P, appendix 1.  (Tr. 22).

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work including lifting 10 pounds occasionally and 5 pounds frequently, standing two hours and sitting 6 hours in an 8-hour workday, with occasional climbing of stairs, balancing, stooping, kneeling, crouching, and crawling.  (Tr. 23).  The ALJ further limited Plaintiff's work to simple routine tasks with frequent, but not constant, contact with co-workers and the public.  (Tr. 23).

In analyzing Plaintiff's RFC, in step four, the ALJ used a two step process.  (Tr. 23). First, the ALJ determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms.  Id.  Second, once the ALJ identified an underlying physical or mental impairment, he evaluated the intensity, persistence and limiting effects of the claimant's symptoms to find out the extent to which the claimant's basic work activities were limited. (Tr. 23).  If objective medical evidence did not substantiate the claimant's statements about intensity, persistence or

symptoms, the ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of her impairments by considering the record as a whole. (Tr. 23).

Starting with the first prong of the step four RFC analysis, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 44). However, at the second prong, the ALJ determined the claimant's statements concerning the intensity, persistence and limiting effects of the impairments were not credible because they were inconsistent with the RFC assessment. (Tr. 24). After examining Plaintiff's claims that in 2003 her back condition required her to lie down 3-4 times a day, the ALJ found that the objective medical evidence does not support the stated disabling severity of her conditions or her need for medication. (Tr. 24). Moreover, the ALJ concluded that Plaintiff had no neurological deficits and did not require surgery. (Tr. 24). In addition, the ALJ noted that the Plaintiff's daily activities counseled against a finding of disability (Tr. 27). The ALJ pointed out that the Plaintiff was able to go to school and earn Bs, could prepare meals, complete laundry, clean the kitchen, manage finances, drive her boyfriend to and from work, and walk her dog. (Tr. 27). Further, the ALJ noted that Plaintiff was able to go shopping, go to the movies, and go to the humane society at least once per week. (Tr. 27). The ALJ also concluded that Plaintiff's excessive narcotic use and possible drug seeking behavior noted in her medical records did "not bolster her credibility." (Tr. 27). Likewise, Plaintiff's medical noncompliance with recommended treatment further eroded her credibility. (Tr. 27).

In making his determination, the ALJ considered the opinion of Plaintiff's treating physician, Dr. Andrew Smith and physician's assistant, Gina Cincinelli, who found that Plaintiff's MRI findings were within normal limits and did not support her pain complaints. (Tr. 26). However, the ALJ declined to give weight to physicians who submitted medical residual

forms in 2008 at the request of Plaintiff's attorney because they were recently completed and were inconsistent with the earlier medical records.  (Tr. 28).

The ALJ noted that the Stage Agency Medical Consultant found that Plaintiff could perform light work.  (Tr. 28).  However, the ALJ further limited Plaintiff's RFC to sedentary work to accommodate Plaintiff's asserted limitations and to afford her relief from the extensive use of lower extremities.  (Tr. 28).

Finally, at the fifth step of the analysis, the ALJ concluded that Plaintiff could not perform her past relevant work.  (Tr. 28).  Next, the ALJ considered whether work incorporating Plaintiff's age, education level and RFC jobs existed in significant numbers in the national economy which she could perform.  (Tr. 29)  Here, the ALJ found that Plaintiff was unable to perform the full range of unskilled light work.  (Tr. 29)  However, even considering Plaintiff's limitations, the ALJ relied on the testimony of the vocational expert to find that Plaintiff could obtain work that existed in the national economy including optical assembler, security monitor, and electonronic/semi-conductor assembler jobs.  (Tr. 29).  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.[7]

## II.    STANDARD OF REVIEW

Under the Social Security Act, the SSA has promulgated regulations that provide for the payment of Child Insurance Benefits to a claimant at least 18 years old who has a disability that began before attaining age 22. 20 C.F.R. § 404.350(a)(5); see Anderson v. Heckler, 726 F.2d 455, 456 (8th Cir. 1984) ("To be eligible for disabled benefits, a claimant must prove that he or she is under a disability at the time of the claimant's application for benefits ... and the disability must be continuous from before age 22 until the claimant's application."). The regulations further

---

[7] However, as the ALJ noted, in a separate decision the Plaintiff was considered to be disabled with an onset date of November 1, 2005, (Tr. 18), which is subsequent to the earlier period of time now at issue in the present case.

define disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  Substantial evidence means more than a scintilla, but less than a preponderance.  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009).  The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Id.  Rather, the court "must take into account whatever in the record fairly detracts from its weight."  Id. (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474. 488 (1951)).

When reviewing the record for substantial evidence, the Court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion.  Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  Moreover, the Court may not substitute its own judgment for findings of fact for those of the administrative law judge. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).   The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Dew v. Comm'r of Social Sec., 2010 WL 3033779 at *16 (D. Minn. 2010) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)).  After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  Thus, the Court will not reverse the ALJ's "denial of benefits so long

as the ALJ's decision falls within the 'available zone of choice.'" <u>Bradley v. Astrue</u>, 528 F.3d

1113, 1115 (8th Cir. 2008).  The decision of the ALJ "is not outside the 'zone of choice' simply

because we might have reached a different conclusion had we been the initial finder of fact." <u>Id</u>.

## III.   DISCUSSION

In this case, Plaintiff challenges the ALJ's decision on five grounds.  First, Plaintiff

alleges that the ALJ improperly discounted the medical opinion of her treating physicians, Dr.

Stormo, Dr. Rhodes, Dr. Kurtti, psychologist Harlan Gilbertson, and Dr. Fitch.  (Pl.'s Mem. in

Supp. of Summ. Judgment, p. 23).  Second, Plaintiff contends that the ALJ violated the SSA's

own rules when he did not obtain evidence from a medical advisor at the hearing and obtain

additional medical evidence concerning the onset of Plaintiff's impairments.  <u>Id</u>. at 24. Third,

Plaintiff asserts that substantial evidence does not support the ALJ's credibility determination.

<u>Id</u>. at 26.  Fourth, Plaintiff challenges the ALJ's RFC finding.  <u>Id</u>. at 28.  Lastly, the Plaintiff

contends that the ALJ's question to the VE was improper.  <u>Id</u>. at 29.

### A.   Whether the ALJ Improperly Discounted the Medical Opinion of Plaintiff's Treating Physician

In making his decision, the ALJ declined to give the opinion of Plaintiff's treating

physicians, Dr. Stormo, Dr. Rhodes, Dr. Kurtti, psychologist Harlan Gilbertson, and Dr. Fitch,

significant weight because they were only  recently completed at the request of legal counsel and

were not supported by prior objective medical evidence.  (Tr. 28).  Instead, the ALJ granted

significant weight to the reports of Plaintiff's treating physician's assistant Gina Cincinelli.  (Tr.

23).  Moreover, the ALJ considered the opinion of the State Agency Medical Consultants who

found Plaintiff could perform light work.  (Tr. 28).

Plaintiff argues that the ALJ did not give sufficient weight to the recent opinions of Dr.

Kurtti, Dr. Rhodes, Dr. Fitch, Dr. Stormo, and psychologist Harlan Gilbertson.  (Pl's Mem., p.

23).  The Plaintiff contends that even through the treating physician's RFCs were formulated

after the Plaintiff's 22nd birthday, these doctors found Plaintiff suffered from chronic

impairments, and the problems necessarily began before Plaintiff's 22nd birthday.  Id.

    "[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence.'" Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002).

However, a treating physician's opinion "do[es] not automatically control, since the record must

be evaluated as a whole." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).  An ALJ may

discount a treating physician's medical opinion, and adopt the contrary medical opinion of a

consulting physician, when the treating source's statements are conclusory, unsupported by

medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by

substantial evidence in the Record as a whole. See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir.

1997); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991).  The opinion of a treating physician

may also be discounted if other assessments are supported by better, or by more thorough,

medical evidence. See, Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Ward v. Heckler,

786 F.2d at 846.  In other words, the ALJ is not required to believe the opinion of a treating

physician when, on balance, the medical evidence convinces him otherwise.  Id.

    Initially, the Court notes that the ALJ correctly placed little weight on the treating

physicians' most recent opinions submitted in support of the Plaintiff's application for benefits

because they did not support a finding that Plaintiff suffered from disabling limitations during

the earlier time period now at issue.   Some of Plaintiff's treating physicians which formulated

RFCs upon which the Plaintiff relies did not even begin treating the Plaintiff until after her 22nd

birthday.  Therefore, such opinions have limited relevance in determining whether the Plaintiff

was disabled before her 22nd birthday.  For instance, Plaintiff provided an RFC analysis completed by Dr. Stormo on August 4, 2008.  (Tr. 1019-1023).  However, Dr. Stormo did not begin treating Plaintiff until August 4, 2004, almost a year after her 22nd birthday.  Likewise, Kimberly Fitch completed an RFC on the basis of Plaintiff's mental impairments on September 28, 2008.  (Tr. 1048).  Ms. Fitch first treated Plaintiff on May 10, 2004, almost 6 months after her 22nd birthday.  (Tr. 1048).  Moreover, Plaintiff opines that the ALJ improperly disregarded Dr. Gilbertson's opinion.  However, Dr. Gilbertson first treated Plaintiff on January 29, 2007, well after Plaintiff's 22nd birthday.  (Tr. 307).   Thus, these doctors had no firsthand knowledge of Plaintiff's ability to function during the relevant time of the alleged disability at issue in this present case.  Even considering the opinions, the RFCs do not differentiate during which time periods (before or after her 22nd birthday) Plaintiff's impairments severely limited her ability to function.  While Plaintiff's medical records after her 22nd birthday demonstrate that her medical condition continued to deteriorate, the RFCs formulated in 2008 by her treating physicians (some of them who only started treating Plaintiff after the period in question before this Court) do not acknowledge this fact or specify when Plaintiff's conditions first became disabling.[8]

Additionally, considering all of the RFCs provided by the Plaintiff from among her various treating physicians, the ALJ properly chose to discount these opinions because they were not based upon the objective medical evidence which showed the severity of Plaintiff's reported pain and mental impairment was not reasonably supported by objective medical evidence during the relevant time frame at issue.  Dolph v. Barnhart, 308 F.3d at 878.

---

[8] Plaintiff contends that these opinions are nevertheless relevant because Plaintiff's conditions were chronic, and therefore, began before her 22nd birthday.  The Court remains unpersuaded by this argument. Simply because a condition is "chronic" does not mean that the severity of the condition remained unchanged throughout its entire period of existence.

Two doctors, Dr. Rhodes and Dr. Kurtti, completed RFCs dealing with Plaintiff's physical limitations. These two doctors both made similar conclusions. Both noted that Plaintiff would have to lie down for extended periods of time throughout the day. (Tr. 1027, 1044). Likewise, both concluded that Plaintiff's condition had a poor prognosis. (Tr. 1028, 1045). Moreover, both placed significant limitations on how long Plaintiff could sit, stand, and walk throughout the day. (Tr. 1028, 1045). Finally, Dr. Rhodes and Dr. Kurtti limited how often Plaintiff could lift, how much weight she could lift, and how often she could bend, squat, climb and reach. (Tr. 1029, 1045).

However, the medical evidence in the record for the time period at issue do not support the limitations set forth in Dr. Kurtti's and Dr. Rhodes' RFC findings.[9] For instance, treating medical professionals consistently found on physical examination that Plaintiff's tenderness on palpation was only mild or moderate. (Tr. 366, 381, 390, 399, 405, 409). Leg raises were found to be normal or cause mild or moderate pain. (Tr. 363, 366, 377, 381, 398, 405, 409). Moreover, treating professionals found Plaintiff's range of motion to be normal. (Tr. 366). Sometimes Plaintiff's range of motion was mildly or moderately limited. (Tr. 381, 390, 405). Additionally, reflexes and flexion were generally normal or moderately limited. (Tr. 363, 377, 398, 405). Treating physicians noted that Plaintiff could ambulate normally. (Tr. 363, 393).

In addition, objective medical tests continued to show no definite nerve impingement and mild to moderate impairments further supporting the ALJ's decision not to grant significant weight to the opinions of Plaintiff's treating physicians. Plaintiff's initial MRI showed vertebral body and disc space heights to be normal. (Tr. 331). At L5-S1, the MRI found a small annular tear within the central and left paracentral portions of the disc where there was a small

---

[9] Additionally, the Court notes that these opinions were completed in 2008 and in no way address whether Plaintiff's alleged disabilitiess caused the same level of impairment in 2003 as they purportedly did in 2008.

superimposed disc protrusion.  (Tr. 331).  No definite impingement of the traversing or exiting

nerve roots was exhibited.  (Tr. 331).  Only mild degenerative arthritis in the facet joints was

evinced.  (Tr. 331).   A second MRI showed a small midline disc herniation at L5-S1 with

preservation of disc space height and disc hydration.  (Tr. 408).  Minimal progression of central

L5-S1 disc protrusion without definite nerve root impingement was also observed.  (Tr. 409).

Plaintiff's third MRI taken shortly after her 22nd birthday showed that the lumbar vertebral

narrow signal height, alignment, and the L1-L5 disks to be normal.  (Tr. 326).   Only mild facet

degenerative changes were noted.  (Tr. 326).  An X-ray showed that the lumbar and vertebral

disk spaces appeared to be normal.  (Tr. 329).  Similarly, only very slight wedging of L1 and T12

were noted.  (Tr. 329).  A second X-ray did not evince any degenerative disc space narrowing,

vertebral spondylolysis, or vertebral misalignment.  (Tr. 325).

        In fact, two physicians who saw the Plaintiff for back pain concluded that her back pain

was inconsistent with her MRIs.  An emergency room doctor noted that "her MRI does not

reveal any injury that is consistent with her pain. This may represent a growing narcotic

dependence problem, more so than a back injury problem."  (Tr. 920).  Gina Cincinelli, who

treated Plaintiff on more than one occasion opined that she was unsure what was causing the

patient's pain and that form a neurosurgical perspective her MRI was within normal limits.  (Tr.

409).

        Moreover, Plaintiff's underwent steroid injections and physical therapy which gave her

some short relief during this time period.  Plaintiff informed physician's assistant Gina Cincinelli

that she had completed 6 to 7 sessions of physical therapy which provided some relief.  (Tr. 411).

Moreover, Plaintiff reported that a steroid injection and the application of heat and ice provided

some relief.  (Tr. 404, 411, 823, 919).

Thus, the objective medical evidence in the record for the time period at issue in this case does not support the RFC findings of Dr. Rhodes and Dr. Kurtti.[10]  Similarly, two state agency consulting physicians found that Plaintiff could engage in more activities than the treating physician's RFC analyses recommended further bolstering the ALJ's conclusion.  (Tr. 930-946, 953, 953-956, 967).   As such, the ALJ properly discounted the opinions of Dr. Rhodes and Dr. Kurtti.

Additionally, three treating providers, Dr. Stormo, Dr. Fitch, and psychologist Harlan Gilbertson completed RFCs concerning Plaintiff's mental impairments.  All three concluded that Plaintiff suffered from anxiety, depression, and pain syndromes relating to her chronic back pain. (Tr. 311, 1019, 1048).  Dr. Stormo concluded that Plaintiff did not suffer any restrictions on her activities of daily living, (Tr. 1020), while Dr. Fitch concluded that Plaintiff's activities of daily living were moderately limited, (Tr. 1049).  Both doctors concluded that Plaintiff had marked periods of deterioration or decompensation.  (Tr. 1021, 1050).  Similarly, psychologist Harlan Gilbertson concluded that Plaintiff had limitations on her ability to perform daily activities and function in a work environment.  (Tr. 312-13).

As with Plaintiff's alleged physical impairments, objective medical evidence in the record does not support the RFCs of Dr. Stormo, Dr. Fitch, and psychologist Harlan Gilbertson for the time period at issue in this case, August 10, 2003 through December 6, 2003.  While a number of doctors noted that she suffered from depression and anxiety beginning at a young age and that she had received treatment for it, no doctor specifically suggested that these conditions were disabling before December 6, 2003 or that they limited her ability to work and function.

---

[10] Additionally, while Dr. Rhodes treated Plaintiff for other issues during the time period at issue in this case, August 10, 2003 through December 6, 2003, the record is bare of evidence showing that Dr. Rhodes treating Plaintiff specifically for her back pain or mental impairments at that time.  Thus, his opinion provides even less guidance for an analysis of Plaintiff's RFC during this time.

(Tr. 167, 430, 438, 818, 933, 971).  Simply mentioning that Plaintiff was previously treated for depression and anxiety does not mean that these conditions were disabling.  Nor did any medical professionals, including those treating Plaintiff after the relevant time period such as Dr. Stormo, Dr. Fitch, or psychologist Harlan Gilbertson, hypothesize as to the severity of Plaintiff's mental impairments during the relevant time period.[11]  The only opinion in the record that overtly addresses Plaintiff's RFC during the relevant time period is Dr. Berry, the state agency consulting physician, who found that Plaintiff's anxiety and depression only mildly limited her activities, social functioning, concentration, persistence and pace during the relevant time period. (Tr. 968-977).   Therefore, the ALJ acted within his discretion when discounting the opinions of Dr. Stormo, Dr. Fitch, and psychologist Harlan Gilbertson.

Plaintiff also challenges the ALJ's reliance on the opinions of agency consulting opinions.  However, the ALJ may discount the opinion of a treating physician if other assessments are supported by better, or by more thorough, medical evidence. See Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007)   Where, as already discussed above, the treating doctor's opinion is not supported by the objective evidence, the ALJ is entitled to rely upon the opinions of consulting physicians.  Moreover, the ALJ did also grant significant weight to the opinion of another of Plaintiff's own treating physician's assistant, Gina Cincinelli, who saw Plaintiff during the relevant time period now at issue in this case. Ms. Cincinelli concluded that she was unsure what was causing Plaintiff's pain because from a neurological perspective, her MRI was normal.  (Tr. 409).   Ms. Cincinelli's opinion supports the ALJ's own assessment that the objective medical evidence in the record did not support finding that Plaintiff's back pain

---

[11] In fact, all the medical records cited by the Plaintiff in support of this argument are from after Plaintiff's 22nd birthday without discussing when her mental impairments became disabling.  Plaintiff discusses the symptoms of anxiety and depression Plaintiff was experiencing at that time.  However, it is unclear to the Court how whether Plaintiff was suffering from increased anxiety and depression after December 6, 2003 is relevant to her ability to function before December 6, 2003.

caused disabling limitations.  Thus, the ALJ did not rely solely on consulting physicians to support his RFC analysis.

When medical evidence conflicts, as is the case here, the obligation of the ALJ is to consider "all of the medical evidence, . . . weigh this evidence in accordance with the applicable standards, and attempt to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir.  2003). The Court is satisfied that the ALJ properly weighed the medical opinions in the record, and he afforded those opinions the weight they deserved when considered on the Record as a whole. See Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir.1995) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.")[12]

Therefore, the Court concludes that the ALJ acted within the scope of his discretion by rejecting the RFC opinions of Plaintiff's treating physicians issued in 2007 and 2008 and that the ALJ's decision here was based on substantial evidence.

**B.      Whether the ALJ Failed to Properly Develop the Record**

Plaintiff next contends that the ALJ failed to follow the Social Security Administration's own regulations when he did not obtain evidence from a medical advisor at the hearing or obtain medical evidence concerning the onset of Plaintiff's impairments before making inferences about them.  Specifically, Plaintiff points to SSR 83-20 which reads:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the [ALJ] should call on the services of a

---

[12] Plaintiff also argues that the ALJ improperly declined to consider the second opinion formulated by Dr. Berry. (Pl's Mem., 28).  However, this RFC was formulated solely and specifically for the time period extending from November 1, 2005 to June 13, 2007, well after Plaintiff's 22nd birthday.  Therefore, this RFC has no relevance to the present disability determination and was properly rejected by the ALJ.

medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

Plaintiff asserts that medical records show that the onset of Plaintiff's impairments began before her 22nd birthday both through retrospective opinions from treating physicians and actual medical records.

In Grebenick, the court addressed the issue of when the ALJ must consult a medical advisor under SSR 83-20. Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997). The court explained that "when there is no contemporaneous medical documentation, we ask whether the evidence is ambiguous regarding the possibility that the onset of her disability occurred before the expiration of her insured status." Id. (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir.1995) ("[A] medical advisor need be called only if the medical evidence of onset is ambiguous.")). Thus, SSR 83-20 "allows the use of lay testimony and medical evidence describing history and symptomology to link an impairment to a date earlier than the first diagnosis documented by laboratory findings." Mendes v. Barnhart, 105 Fed.Appx. 347, at *4 (3rd Cir. 2004).

SSR 83-20 states that "in some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g. the date the claimant stopped working." (emphasis added). Thus, this rule primarily applies when no medical evidence at all has been presented as to when the disabling impairment began. See Grebenick, 121 F.3d at 1200 ("when there is no contemporaneous medical documentation, we ask whether the evidence is ambiguous regarding the possibility that the onset of her disability occurred before the expiration of her insured status.") Here, however, the record now before the Court contains significant medical evidence allowing the Court to determine the alleged onset date, and the ALJ stated specifically

that he "reviewed all of the objective medical evidence and primarily the evidence prior to

2004." (Tr. 27). Moreover, this evidence is contemporaneous with Plaintiff's alleged onset date

of August 10, 2003 and evidence that her alleged impairment continued until her 22nd birthday

on December 6, 2003. This is not a case where scant medical evidence exists about when the

Plaintiff's impairments began or where the ALJ determined that insignificant evidence existed to

guide his decision. Further, the crux of the present case is <u>not</u> the date of onset, but rather,

whether during the relevant time frame Plaintiff's medical issue met the definition of disability

entitling her to receive benefits. As already discussed extensively in the preceding section

above, the record contains objective medical evidence supporting the ALJ's conclusion that

Plaintiff's back pain did not constitute such a severe impairment necessitating a finding of

disability before her 22nd birthday. Thus, the ALJ was not required to further develop the record

on his own by obtaining testimony from a medical advisor in this case.

 In addition, the Plaintiff reargues that the ALJ should have reviewed the retrospective

RFC opinions of Dr. Rhodes, Dr. Kurtti, Dr. Fitch, psychologist Harlan Gilbertson, and Dr.

Storm issued in 2007 and 2008. (Pl's Mem., p. 25). "If the [treating doctor's retrospective]

diagnosis is based upon a medically accepted clinical diagnostic technique, then it must be

considered in light of the entire record to determine whether it establishes the existence of a

physical impairment prior to the expiration of the claimant's insured status." <u>Basinger v.

Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984). First, as extensively discussed above, the ALJ did

consider these opinions, but he properly chose to give them no weight based on the record as a

whole; such a decision was based on substantial evidence. Second, none of the treating doctors

actually made a retrospective diagnosis as to when exactly Plaintiff's alleged infirmities or

medical conditions became debilitating.

The Court concludes the ALJ did not fail to properly develop the record.

**C.     Whether Substantial Evidence Supports the ALJ's Credibility Determination**

In making his own RFC determination, the ALJ determined that the Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms prior to her 22nd birthday were not credible.  (Tr. 14).  In particular, the ALJ noted that Plaintiff's symptoms were not substantiated by objective medical evidence.  (Tr. 24).  Moreover, the ALJ noted that Plaintiff received 6 months of unemployment compensation after she was fired from her job as a daycare worker which adversely affected her credibility.  (Tr. 27)(citing Jernigan v. Sullivan, 948 F.2d 1070 (8th Cir. 1991).  In addition, the ALJ noted that the Plaintiff was able to attend school and complete other daily tasks incompatible with a finding of disability.  (Tr. 27).  Lastly, the ALJ noted that the medical record notations about the Plaintiff's excessive use of narcotics and possible drug seeking behaviors in 2003 also undermined her credibility.  (Tr. 27).

The Plaintiff challenges the ALJ's finding in this regard because a claimant does not need to be completely house bound to be found disabled.  (Pl.'s Mem., p. 26).  Moreover, Plaintiff's narcotic use did not result in a decrease in her pain arguably demonstrating her credibility regarding complaints of pain.  Id.  Plaintiff also argues the ALJ's reliance on Plaintiff's attendance at school and noncompliance with medical treatment directions were not supported by substantial evidence.  (Pl's Mem., pp. 26-27).

The governing law makes clear that credibility determinations are initially within the province of the ALJ.  Driggins v. Bowen, 791 F.2d 121, 124 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  Courts "'will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.' " Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006); see also Pearsall v. Massanari, 274 F.3d

1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.").   As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).  To make an express credibility determination, the ALJ must set forth the inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995).

The evaluation of a claimant's subjective symptoms typically include their prior work record and the observations of third parties, and of physicians, concerning: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the reported subjective symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  A claimant's daily activities are a "factor to consider in evaluating subjective complaints of pain." Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).    Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

In making his decision in the present case to discredit Plaintiff's subjective complaints of pain, the ALJ relied on substantial evidence in the record demonstrating that Plaintiff's daily activities and complaints regarding the persistence and intensity of her pain during the time

frame at issue were inconsistent.  For example, Plaintiff completed a final exam on September 9, 2003 and earned a B+ in the class.  (Tr. 1052).   Plaintiff was able to cook small simple meals for herself in 2003.  (Tr. 27).  On Plaintiff's own function report, completed as late as 2006, she noted that even then she dropped her boyfriend off at work and picked him up each day.  (Tr. 77).  She takes care of a dog and cat.  (Tr. 78).  While she has purports to have trouble dressing herself and doing laundry, nevertheless, each week she goes shopping for groceries and personal care items and goes to volunteer at the Humane Society.  (Tr. 78-81).

The ALJ did not rely solely on Plaintiff's reported daily lifestyle activities to discount her credibility.  In addition, the ALJ opined that the medical record documents excessive narcotics use and possible drug seeking behaviors.  The ALJ may properly consider such evidence.  <u>See Booker v. Astrue</u>, 2009 WL 1886134 at *38 (D. Minn., June 30, 2009)("A claimant's misuse of medications is a valid consideration in an ALJ's credibility determination and drug seeking behaviors can discredit a plaintiff's allegations of disabling pain."); <u>Marrotte v. Barnhart</u>, 107 Fed. Appx. 14, 16, 2004 WL 1809465 (8th Cir. 2004) (upholding ALJ's findings discounting plaintiff's credibility because of record of drug-seeking behavior).  Even when a claimant may validly require pain medication, an ALJ may still consider a Plaintiff's overuse of prescribed medications assessing credibility.  <u>Anderson v. Barhart</u>, 344 F.3d 809, 815 (8th Cir. 2003)(stating that "[w]hile we appreciate [the plaintiff's] need for prescribed medications to treat the severe pain ... we do not think that undercuts the ALJ's finding on [plaintiff's] overuse of medications ... A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations.")

Here, substantial evidence on the record supports the ALJ's findings that the Plaintiff overused narcotic medication.  On August 5, 2003, Dr. Lubka noted that, although he did not

think Plaintiff was willfully turning to be a drug seeker, the number of medicines taken was not

appropriate.  (Tr. 373).  Dr. Lubka further noted that if he was not able to wean her off pain

medicine, the doctor stated he would no longer prescribe them and would arrange for treatment

at a chronic pain clinic.  (Tr. 373).  On September 21, 2003, an emergency room doctor

counseled Plaintiff about the adverse outcomes with accelerated narcotic abuse and the need for

controlling it by having one doctor monitor prescriptions.  (Tr. 924).  Plaintiff was told not to

seek anymore narcotic pain medicine through the emergency department.  (Tr. 924).  One week

later, another emergency room doctor found Plaintiff to be a complicated pain medication issue

considering her multiple narcotic medication especially "since her MRI does not reveal any

injury that is consistent with her pain. This may represent a growing narcotic dependence

problem, more so than a back injury problem."  (Tr. 920).  At the Medical Pain Clinic on

October 14, 2003, a doctor opined that Plaintiff may have a chemical dependency problem.  (Tr.

825).[13]

The ALJ also relied on significant other objective evidence that did not support Plaintiff's

claims of disabling pain and thus contributed to the ALJ's assessment of her diminished

credibility.  As already discussed, the medical record for the relevant period before the Plaintiff's

22nd birthday shows mostly objective indications of only mild or moderate symptoms

inconsistent with Plaintiff's subjective complaints of severe pain and disabling mental

impairments.  "Although an ALJ may not disregard a claimant's subjective pain allegations

solely because they are not fully supported by objective medical evidence, an ALJ is entitled to

make a factual determination that a claimant's subjective pain complaints are not credible in light

---

[13] This possible drug seeking behavior continued even after Plaintiff's 22nd birthday.  (Tr. 170, 470, 491, 509, 511, 760, 863, 894, 903, 906).

of objective medical evidence to the contrary." Gonzales, 465 F.3d at 895 (citations and quotations omitted).

Finally, the ALJ stated that "there is an indication of medical noncompliance with recommended medical treatments."  (Tr. 27).  The ALJ is entitled to discount Plaintiff's subjective complaints of disabling pain in light of her failure to follow her doctor's recommendations.  See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008); Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992).  While as the Plaintiffs point out, there are records which show compliance with treatment, some other records do in fact indicate a lack of compliance with the recommended treatment.  (Tr. 767, 773-774, 785).  Moreover, even without  any evidence of noncompliance, the Court cannot say that the ALJ improperly determined Plaintiff's credibility on the basis of the record evidence of her activities of daily living, drug seeking behavior, and objective medical evidence inconsistent with her subjective complaints of severe.

Consequently, the Court concludes that the LAJ's determination regarding the Plaintiff's lack of credibility is supported by substantial evidence.

### D.      Whether the ALJ Erred in His Own Assessment of the Plaintiff's RFC

The ALJ found that the Plaintiff had the:

capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a), lifting 10 pounds occasionally and 5 pounds frequently, standing 2 hours and sitting 6 hours in an 8-hour workday, with occasional climbing of stairs, balancing, stooping, kneeling, crouching and crawling and limited to simple routine (unskilled) tasks with frequent, rather than constant, contact with co-workers and the public.

(Tr. 23).

The Plaintiff argues that the ALJ improperly formulated her RFC because the decision was not based on some of her submitted medical evidence and was instead based on the opinions of non-treating, non-examining state agency doctors.  (Pl's Mem., p. 28).

Regulations require the ALJ to consider how all of the claimant's impairments, including any symptoms such as pain cause physical and mental limitations that may affect the ability to work in formulating a claimant's RFC.  20 C.F.R. § 404.1545. "The ALJ must determine the claimant's RFC based on all relevant evidence, including, medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations." Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  An ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). However, it is the claimant's burden, not the Commissioner's, to prove the RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F .3d 777, 779 (8th Cir. 1995)).

As discussed above, the ALJ properly discounted the 2007 and 2008 opinions of Dr. Berry, psychologist Harlan Gilbertson, Dr. Kurtti, Dr. Stormo, Dr. Fitch, and Dr. Rhodes, and the ALJ also properly analyzed Plaintiff's diminished credibility.  Therefore, Plaintiff's arguments that the ALJ's RFC is improper relies upon the same previously rejected arguments by Plaintiff that the ALJ incorrectly weighed the physicians' opinion and wrongly decided that Plaintiff's subjective complaints were not credible.

The ALJ's formulation of the RFC based on his conclusions regarding Plaintiff's credibility and the opinions of treating physicians was proper for the reasons already set forth in the preceding sections above.

### E.     Whether the ALJ's Hypothetical Question to the Vocational Expert Was Correct

Lastly, Plaintiff argues that the hypothetical question posed by the ALJ to the VE does not constitute substantial evidence because it was based on an improper RFC formulated by the ALJ.  (Pl.'s Mem., p. 29-30).  As such, according to Plaintiff, the VE's conclusion regarding

whether Plaintiff can perform work existing in significant numbers in the national and regional economy cannot be used to support the ALJ's decision.  Id.

After assessing Plaintiff's RFC, the ALJ asked the VE whether, a person with the Plaintiff's RFC could perform her past work as a day care worker.  (Tr. 1094).  The VE testified that such a person could no longer perform her past relevant work in child daycare. (Tr. 1094). However, the VE further testified that such a hypothetical person could perform some other jobs such as an optical assembler, semi-conductor bonder, and a security monitor.  (Tr. 1094-95). The VE concluded that such jobs do exist in significant numbers in the national economy.  Id. Then, the ALJ relied on the VE's conclusion for his determination that the Plaintiff could perform relevant work and was therefore not disabled.  (Tr. 29).

"A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." Howard v. Massanari, 255 F.3d 577, 581-82 (8th Cir.2 001).  In order to constitute substantial evidence, testimony from a VE must be based on a properly phrased hypothetical question. Id.; Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000). A hypothetical question is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Roberts, 222 F.3d at 471.

In this case, the ALJ's RFC finding was supported by substantial evidence in the record as a whole.  As discussed above already, the ALJ properly discounted the 2007 and 2008 RFC opinions of some of Plaintiff's treating physicians.  Furthermore, the ALJ made a properly supported credibility finding that the Plaintiff's subjective complaints of severe pain and mental impairments did not comport with her activities of daily living, drug seeking behavior, or other objective medical evidence.  As such, the Court finds that the ALJ's hypothetical question to the VE was proper and the VE's conclusions constituted substantial evidence upon which the ALJ

could base his decision.  See Davis v. Apfel, 239 F.3d 962, 966. (8th Cir. 2001) ("A hypothetical

is sufficient if it sets forth impairments supported by substantial evidence in the record and

accepted as true by the ALJ"); Rappoport v. Sullivan, 942 F.2d 1320, 1323-24 (8th Cir. 1991)

(finding testimony from a vocational expert, based on a properly phrased hypothetical question,

constitutes substantial evidence supporting the ALJ's decision).

Based on the above reasoning, the Court finds Plaintiff's request that this case be

remanded for a new RFC and hypothetical to the VE by the ALJ inappropriate.  The RFC and the

hypothetical formulated by the ALJ and submitted to the Vocational Expert were supported by

substantial evidence in the record.

**IT IS HEREBY RECOMMENDED THAT:**

1.  Plaintiff's Motion for Summary Judgment (Docket No. 13) be DENIED;

2.  Defendant's Motion for Summary Judgment (Doc. No. 18) be GRANTED.

Dated:  February 3, 2012                          /s Leo I. Brisbois_____
                                                  Leo I. Brisbois
                                                  U.S. MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation

by filing with the Clerk of Court, and serving all parties **by February 17, 2012**, a writing that

specifically identifies the portions of the Report to which objections are made and the bases for

each objection. A party may respond to the objections within fourteen days of service thereof.

Written submissions by any party shall comply with the applicable word limitations provided for

in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the

objecting party's right to seek review in the Court of Appeals.  This Report and

Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.